Moncure, J.
This is an appeal from a sentence of the Circuit court of Accomack, admitting to probat a paper purporting to be the will of George Nock, who *107 died unmarried and without issue, on the 6th of October 1851, leaving a large estate. His only heir at law was his sister, Catharine Nock, whose only children were two daughters; one of them married to Samuel M. Turlington and the other to Richard S. Rew; and each of them having several children. His only devisees and legatees were three of the children of his niece, Mrs. Turlington, to wit: John, Samuel and Ann: The bulk of his estate being left to John and Samuel, and a negro girl only to Ann. John Arlington, the draftsman of the will, and Samuel M. Turlington, were nominated sole executors, and propounded the will for probat; and Catharine Nock, the heir at law, contested it, and has appealed from the sentence.
The counsel for the appellant contended, in opposition to the will, that it was executed by the testator just at the close of his life, when both mind and body were so weakened and perverted by intemperance, that even if he was of clear, testable caj>acity, he was the easy subject of impressions improperly made upon him. That the evidence strongly tends to show clandestinity and unfairness on the part of the draftsman of the will, and of the father of the beneficiaries. That two of the subscribing witnesses, Arlington and Savage, gave false testimony, and are not credible; and the other, Dr. Harmanson, though unimpeachable on the score of integrity and intelligence, does not prove the due execution and attestation of the will. That there is no proof that the contents of it were known to the testator when it was executed. That the circumstances attending its execution, if they do not prove conclusively imposition and practice on the testator, are of a character to impress on the court the duty of the closest scrutiny into all the ceremonial of a regular, formal and legal execution of the instrument. And that, conceding the truth and consistency of all the testimony, the signature of the testator is *108 not authenticated as the law requires, and the will was not duly attested.
An immense mass of testimony was taken in the case, and forms a part of the record; which I do not deem it necessary, and it would take too much time, to review in detail. The will was executed and attested on the day of the testator’s death, about six hours before that event took place, but had been prepared on a former day. His last sickness was of short duration; having commenced but a day or two before his death. He was able to walk about the house, and did do so on the day of his death, both before and after the attestation of his will. He was not an old man, being about fifty-five years of age. Hone of the testimony tends to show that he was ever, to the moment of his death, of unsound mind. Dr. Harmanson, his attending physician, and one of the attesting witnesses, proves that he arrived at his house on the day of his death, a little'after 11 o’clock A. M. and remained there till 4 P. M. That the will was executed about an hour and a half after his arrival. That the testator was of sane mind, and during the whole time he saw him, spoke and acted rationally ; and when he acknowledged his will, seemed to be perfectly conscious and sensible of what he was about : and the doctor states the purport of the conversation that occurred between him and the testator, which fully confirms the opinion of the former as to the state of the latter’s mind. The testator was a man of intemperate habits, and frequently drank to excess at public places, but was usually sober at home; though for some time before his death he had been engaged in distilling peach brandy, and seems to have been in the daily habit of drinking toddy or grog. The doctor thought when he arrived that the testator had been drinking, but would not have been led to that conclusion by anything that he did or said, except his .asking *109 for something to drink. He was apparently excited, and was nervous; and this nervousness, the doctor supposed, had been brought about by continued excessive use of ardent spirits. But he thought the testator’s mind was sufficiently calm and composed for the purpose of making a will. The testator was an industrious, thriving man, and at all times careful of his property. It does not appear that he was ever in a condition, from drunkenness or otherwise, to be defrauded or imposed upon. Nor does it appear that the draftsman of the will, the father of the beneficiaries, or any other person for them, ever made any attempt to defraud or impose upon him, or any suggestion to liim in regard to the disposition made of his property by his will; or ever possessed, or attempted to exert, any influence over him. Nor does it appear that there was any clandestinity or unfairness in the preparation or the execution of the will; or that the testator was not perfectly conscious of its contents, and did not voluntarily and deliberately dictate them. On the contrary, it appeared that he had become offended (whether justly or not is immaterial) with his sister Mrs. Nock, and her son in law, Mr. Eew, especially the latter; and had formed a settled purpose, declared on many different occasions, and to many different persons, during the last year, and especially the last week, of his life, to give none of his property to them or the children of Mr. Eew; but to dispose of it in the manner in which he disposed of it by his will. It was proved that Arlington is a young man of good character, and ordinary intelligence and education; and Savage is an ignorant, and illiterate man; and no attempt was made to impeach the character of either of them. It did not appear, nor was any attempt made, (except by a question propounded to Savage in regard to himself,) to show that either of them had any interest in the establishment of the will, or was *110 in any way connected with the beneficiaries. To convict them of fraud and perjury in the transaction, reliance is placed, alone, on the supposed inconsistency and contradictory character of their statements with themselves, and each other, and with the other testimony in the case. This intrinsic evidence of their guilt should certainly be very plain and strong to convict them; and ought not to have that effect, if their supposed inconsistencies and contradictions can be explained and reconciled in any rational way. I think they have been so explained and reconciled in the opinion of the court below; which, I think, is warranted by the evidence; and were I called upon to decide this case originally, upon the evidence as it is written, without the advantage of seeing the witnesses, and hearing them speak, I would come to the same conclusion that he did. But we have to decide this case on an appeal from the decision of a learned judge who saw and heard the witnesses testify, and certifies their evidence in such language as this: “ There was nothing in the manner of the witnesses, in their relations to the parties in interest or on the record, or in their connection with this cause, which has excited in my mind the slightest distrust of their truthfulness. Nor was there anything in the matter to which they testified on any important point to which I do not give full credit.”—“ I take pleasure in saying that both the manner of the witnesses and their testimony have made an impression upon my mind very favorable to their characters. The subscribing witnesses to the will, and most of the other witnesses, were examined separate and apart from each other, and in all points which I regard as material, there is a remarkable consistency in their statements.” This court, on a mere question of credibility of witnesses, will always presume that the inferior courts, which saw and heard the witnesses examined, decided *111 correctly. Dudleys v. Dudleys, 3 Leigh. 436; Jesse v. Parker, 6 Gratt. 57. Therefore, even if I doubted, which I do not, the correctness of the opinion of the court below as to the credibility of the evidence, I would follow it rather than my own.
Conceding then the truth of all the testimony, it becomes unnecessary to decide whether, if that of Arlington and Savage were rejected as incredible, Dr. Harmanson’s alone would sustain the will: and it is affirmatively and positively proved, that on Saturday, the 4th of October, two days before the testator’s death, when he was very little if at all indisposed, he sent for Arlington to write his will, who accordingly came, and alone with the testator in a room up stairs, prepared it according to his dictation, and read it twice over to him, he being then sober and rational; that it was not then executed and attested, because there were not witnesses enough present who could write their names, but he requested Arlington to bring it on the succeeding Monday for the purpose of execution and attestation; that Arlington accordingly brought it to the testator’s house on Monday; when, after ascertaining from the doctor that the testator (who was then very sick, but had on Arlington’s arrival enquired for the will, and expressed his desire to have it executed,) was in a situation to make a will, he presented it to him for execution, and it was accordingly executed and attested, with a full knowledge of its contents on the part of the testator, and an unbiassed intention to do what he did. It may well therefore be said, in the emphatic language of the court below, “that the whole transaction, from the beginning to the end of it, was entirely fair and bona fide; and if, by any slip, this paper has not been so authenticated as to be valid as the will of George Nock, his true will, his real, settled, and well settled and determined wishes in regard to the disposition of his property will be defeated.” Let *112 us now see whether there was any such sliy>; and proceed to consider, what are called, by the learned counsel for the appellant, the two legal questions which arise upon the execution of the will.
I. Whether it was signed or acknowledged by the testator, in the presence of at least two competent ■witnesses present at the same time.
A court of probat occupies the place of a jury as to questions of fact, and its province is, like that of a jury, to draw all just inferences from the evidence. Smith v. Jones, 6 Rand. 33; Boyd v. Cook, 3 Leigh 32; Dudleys v. Dudleys, Id. 436; Clarke v. Dunnavant, 10 Id. 13. Every reasonable presumption ought to' be made by a jury or court of probat in favor of a will, when there is no doubt of the testator’s intention. Bond v. Seawell, 3 Burr. 1773; Smith v. Jones, 6 Rand. 33. Applying these principles to the question under consideration, there can be no difficulty in its solution. If the evidence does not positively prove that the will was both signed and acknowledged by the testator in the presence of the witnesses, it at least proves facts from which a court of probat ought to infer that it was so signed and acknowledged; or proves that the testator made his mark, and acknowledged the will, in the presence of the witnesses, from which a court of pro-bat ought to infer that the will when acknowledged, had been signed by the testator, or some other person in his presence and by his direction. Dr. Harmanson proves that the paper was handed to Mr. Nock for his signature; he took the pen in his hand, as witness supposed to make his signature, but remarked to Mr, Arlington, “ Oh, I can’t write; do you write it for me.” Arlington then aided him in making a cross; testator making one mark, and Arlington the other. Witness then took the will in his hand and said, “ Mr. Nock, is this your will and testament?” He replied, “ It is, sir.” Mr. Arlington then taking hold of the *113 will with the witness, and holding it to Mr. Nock, said, “You acknowledge it as such?” He replied, “Certainly, certainly, I do.” Witness does not recollect seeing Arlington sign the testator’s name, nor whether it was to the will when it was acknowledged. Arlington proves that the testator requested him in the presence of the witnesses to write his name for him, and he made a cross mark. He does not recollect where he signed the name. He might have signed it on his knee, in the room where the testator lay; or he might have signed it at the secretary in the adjoining room. He is certain that he signed it in the one place or the other. He first wrote the name, and after testator had crossed the mark, witness wrote “his acknowledgment.” Savage being a marksman, his evidence is of little importance on this branch of the subject. I think the evidence above stated fairly shows that the will was both signed and acknowledged at the same time. But at all events, it shows that the signature of the testator was to the will when it was acknowledged; for Arlington proves it was made in the order of time before the mark, and all the witnésses prove that the mark was made when the will was acknowledged. If the signature had not been to the will when it was acknowledged and attested, Dr. Harmanson would have observed so important an omission. As Judge Cabell said,,in Dudleys v. Dudleys, 3 Leigh 443, “It is not usual for men to acknowledge papers, either as deeds or wills, and call on others to attest them, before they are signed. Such a thing may happen; and when it is proved to have happened, the acknowledgment and attestation will be disregarded. But, in the absence of all proof to the contrary, the acknowledgment and attestation give rise to an irresistible inference that the instrument had been previously signed. A contrary course would defeat a vast number of wills; for it may often happen, and frequently does happen, *114 that a witness not only does not remember to have seen the signature, but he does not remember the acknowledgment or the attestation.” If the signature of the testator was to the will when it was acknowledged, it is unimportant whether it was put there at that time or before. The mark was made at that time, which made the signature, if then there, that of the testator, by adoption; and at all events it may be said, in the language of the same judge, that “the acknowledgment is a ratification of the signature; and from that ratification we may fairly infer, that the signature was made in his presence and by his direction.” I deem it unnecessary to enquire what would have been the effect, if the name of the testator had been signed in the order of time after the acknowledgment and attestation, and on the secretary in the adjoining room where the will was subscribed by the witnesses, as the evidence presents no such case.
This is a much stronger case in favor of the will than that of White v. The British Museum, 19 Eng. C. L. R. 91, in which the will was established. There it was found, in a special verdict, that none of the witnesses saw the testator’s signature; though it was also found, that the will was signed by the testator before it was signed by the witnesses. There was no room for inference on the subject. Here, there is not only room for inference, but it is almost certain, that the witnesses saw the signature when the will was acknowledged, 'but have forgotten the fact, as it made little or no impression on their memories. There is no more necessity under the present statute of wills than under the former, that the witnesses should see the signature of the testator at the time of the acknowledgment of his will; much less, that they should always remember the fact of their having seen it. If there be any difference in the phraseology of the two statutes in this respect, such necessity would seem to *115 be less required by the terms of the present than the former. The new statute expressly authorizes the will to be acknowledged, and drops the word “attested,” contained in the old; and it also expressly dispenses with the necessity of a form of attestation. It differs from the statute, 1 Vict. ch. 26, § 9, which requires the “signature,” not the “will,” to be acknowledged; and retains the word “attest,” as well as “subscribe.” It was certainly never intended, by the framers of our new statute, to require the subscribing witnesses to prove that they saw the signature of the testator at the time of the acknowledgment of the will. That would be to make the validity of wills “depend upon the memory and good faith of a witness, and not upon reasonable proof that all the requirements of the statute had in fact been complied with.” Jesse v. Parker, 6 Gratt. 64; Clarke v. Dunnavant, 10 Leigh 13. Let us now consider the remaining question in the case; which is,
II. Whether the witnesses subscribed the will in the presence of the testator.
The counsel for the appellant contended, that “upon the proof it does not appear that the testator was conscious that the act of attestation was going on at all.” If this were so, the will was certainly not attested in the presence of the testator, within the meaning of the statute; for it must be a conscious presence on his part. But is this the fact ? Conceding the sanity of the testator at the time of the attestation, which is fully proved, the facts stated by Dr. Harmanson, taken alone, show that the testator made his mark and acknowledged the will in the presence of the witnesses, in order that they might attest it, and must have been conscious of the act of attestation at the time it was going on. But regarding Arlington and Savage as credible, no question could or would be-raised on the subject.
*116 Th'e facts in regard to the physical condition of the testator, and the relative position of himself and the witnesses at the time of the subscription of the will by the former, are as follows : He was taken sick on Sunday, and died the following Monday night. According to Dr. Harmanson, his disease was inflammation of the throat. He was week and very sick, but had sufficient strength to rise from his bed. Shortly after the doctor arrived, he got up and went into the adjoining room to get something to drink. According to Arlington, he was feeble that day from disease, but not so feeble as might be supposed, for one dying so short a time afterwards. He was strong, walking the floor both before and after the execution of the will. He was in the porch about ten minutes before; and was in the room in which the will was subscribed by the witnesses, walking the floor, after the will was executed and attested. There are two rooms to the house, the one called the little room and the other the big room; which were separated by a mere partition wall, in which there was a door connecting the two rooms. When the will was acknowledged and attested, the testator was lying on his back on a trundle bed in the little room. The bedstead was about a foot high, and on it was a feather bed of ordinary size. The testator had under his head three or four pillows and a bolster. When he acknowledged his will to the witnesses, two of them, Dr. Harmanson and Arlington, had it in their hands ,* and Dr. H. says, “There being no writing desk or table in the room where he was lying, I stepped into the adjoining room, carrying the will in my hand, and accompanied by Mr. Arlington, and I think Mr. Savage, and there signed the will, or witnessed it, on a bureau or secretary.”—'“I then gave the pen to Mr. Arlington, and retired to the room where Mr. Hock was lying; left Mr. Arlington, and, I believe, Mr. Savage in the room, with the will in their *117 possession. Do not recollect of seeing them sign the will, and did not see” it afterwards, except in the court-house. The doctor left the will on the bureau, where he had signed it, and Arlington and Savage immediately signed their names, each standing in the same place in which Dr. H. had stood; and Arlington signing the name of Savage at his request, who made his mark. Arlington says, that after the will was attested, he carried it to the testator, who, in the presence of the witnesses, acknowledged it as his last will and testament, and requested Arlington to keep it: though of that fact Dr. Ii. has no recollection. When the witnesses subscribed their names, the door between the two rooms was open; and the testator, as he lay on the bed, could see the entire persons of the witnesses except their forearms and writing hands; which, and the will, he could not see, because the witnesses, in fronting the bureau to sign their names, stood with their backs towards the testator. The distance from the bed to the bureau was sixteen or seventeen feet.
These, I believe, are all the material facts on which the question under consideration depends: And that question in effect is, Whether'a will (everything being fair and bona fide,) is subscribed by witnesses in the presence of the testator, when they are in full view of each other, and but sixteen or seventeen feet apart; when the table or other thing on which the will is signed is also in the testator’s view; and when he is mentally competent to supervise the transaction, is conscious of what is going on, and is physically able to walk about; but when, in the actual position in which he chose to remain at the instant of the signing, he was prevented by the bodies of the witnesses from seeing their forearms and writing hands, and the paper itself?
The statute uses the word presence, but has not attempted to define it. Its meaning depends upon *118 the circumstances of each particular case; and the duty of ascertaining it devolves on the court or jury • which has to decide the case; their guides being reason and common sense, controlled only by authoritative adjudications. It is a word of which every man has something like a just idea, but which no man can accurately define. In fact, it implies an area which has no metes and bounds; but is contracted .or enlarged according as the attestation occurs, as it certainly may, “in a small chamber, or a spacious hall, a public street or an open field.” To relieve the mind from the labor of ascertaining the meaning of the word in its application to particular cases, courts have endeavored to give at least a partial definition; and accordingly, at a very early period after the enactment of the statute of 29th Charles 2, it was determined, as a general rule, that an attestation in the same room with the testator, and at his request, is an attestation in his presence; whether or not, the will or the witnesses were visible to him, or in the range of his vision, at the time of attestation: clandestinity or other fraud in the attestation, or mental incompetency of the testator at the time, formed of course, an exception to the rule. No other excejition, so far as I know or remember, has ever been recognized to- this general rule, save that which was established by this court in the case of Neil v. Neil, 1 Leigh 6: which case was the first of its kind, and yet stands by itself j having, I believe, been recognized as law nowhere else than in Virginia, but having been repudiated elsewhere. Orndorff v. Hummer, 12 B. Monr. R. 619. See also Newton v. Clarke, 7 Eng. Ecc. R. 125. Had I been a member of the court when that case was decided, I would have concurred with the minority, Judges Brooke and Carr, and with the judges of the courts below, common law and chancery, in sustaining the will. Still, I regard the case as a binding authority, *119 and the rule of stare decisis would induce me to follow it as closely, in a like case, as if it had my entire approbation. Its effect has been to modify in this state, the general rule, and add thereto this proviso, that if the testator be physically unable to change his position the witnesses must make their subscriptions within the range of his vision. I have no fault to find with the general rule, which seems to have much reason in it. The four walls of a room, whatever may be its size, so completely enclose its area and exclude all improper interference from without, that whatever may be done within them may generally be said to be done in the presence of all who may be therein. But we must be careful not to be misled by this general rule, and mistake the evidence of the thing for the thing itself. It shows that when a will is attested in a certain situation in regard to the testator, it is done in his presence; not that it can in no other situation, and under no other circumstances be done in his presence. It is partial, not complete or exclusive, in its nature. We must look to the reason of it. The word room does not occur in the statute; nor does the word sight. Presence is the only word there used; and where it exists sight is unnecessary, and the statute is satisfied. A blind man can make a will; which of course he could not do if sight were necessary. Though a thing cannot be done in the sight, it may be done in the presence, of a blind man; and therefore a blind man may make a will. Proximity and consciousness may create presence. A room cx vi termini denotes such proximity as is required to constitute presence: but there may be such proximity, as well without as within a room. And wherever that proximity exists and presence is created, it has the same effect as if the transaction occurred in the same room, and sight becomes unnecessary. When a testator is in one of two adjoining rooms, of which the door of communication *120 is closed, what is done in the room is done in his presence, and what is done in the adjoining room is done • out of his presence. But throw open the door, and place the witnesses and the table on which they are attesting the will in the adjoining room, directly before the testator, and they are in his presence. The moment the range of vision becomes unobstructed, the distinction between the same room and different rooms ceases; the partition wall is broken down, and the two rooms are turned into one. The power to see, and actual sight, are then equivalent and convertible terms. It would be strange indeed, if there should be any real difference in such a case between the same room and adjoining rooms; and the apparent difference can only be created by a misconception produced by the general rule of which I have been speaking. Suppose that the distance between the testator and the witnesses, as in this case, is but sixteen or seventeen feet; less than the length of an ordinary room. Why should it make any difference whether they ai-e in the same or different rooms ? If they were in the same room, the attestation would be good. And why not, if they are in different rooms ? Prima facie, it is said, if the attestation be in the same room, it is in the presence; otherwise not. But proximity, and the removal of the obstruction to the range of vision, repel this prima facie effect in the latter case. Suppose the transaction had occurred under an arbor, or in an open field: such proximity would imply presence, and the attestation would be good. Why is it not at least as good when it occurs in an adjoining room of the same house? Has not the testator the same safeguards against fraud and imposition as if it had occurred in the same room? Has he not the same supervising control over the attestation in the one case as the other ? Can he not, in one case as much as in the other, see that those who attest the will are the persons in whom he con *121 fides, and that a false paper is not surreptitiously imposed on the witnesses ? But what limits can be put upon such a doctrine as is contended for, and to what extent would it carry us ? Suppose the testator is in perfect health, and sitting in one room just at the open door, and the witnesses are sitting in the adjoining room, just at the same door, and within a foot of the testator, but accidentally with their backs towards him: will they be considered as not in his presence, merely because, in the actual position in which he happens to be, he cannot see their forearms and writing hands, and the paper itself? The statute says nothing about forearms, or writing hands, or seeing the will itself. It requires the witnesses to subscribe their names in the testator’s presence. He cannot, in the nature of things, see their whole persons at the same time. They are in his presence, whether their backs or their faces be towards him. And if, being in his presence, they subscribe their names, the statute is literally complied with. There is not even a slip of form, and the attestation is good. If he does not choose to see, when he can so easily see, the forearms and writing hands and paper itself, and when he sees and hears that the attestation is going on, it is the same thing as if he had actually seen them.
The fact is, that the general rule before referred to is not better established than another, which is, that if the attestation be in an adjoining room, and in the range of the testator’s vision, it is in his presence: And in no case, English or American, before or since the revolution, from the leading case of Shires v. Glasscock, down, unless it be a case recently decided in North Carolina, of which I will presently have occasion to speak, has this rule been so far modified as to require, not only the witnesses themselves, but their forearms and writing hands and the paper itself, to be in the range of the testator’s vision at the in *122 stant of the attestation. And in the cases in which the attestation was not in the same room, it has been • considered as done in his presence, if he was in a position from which he might, if he chose, see the witnesses subscribe without changing his • situation. That fact being ascertained, the enquiry has not been prosecuted further to ascertain whether the witnesses, in sitting down or standing at the table to write their names, had their backs or faces towards the testator. Had such an enquiry been deemed material, can it be believed that it would not have been made in some case during the long interval of more than one hundred and seventy years which has elapsed since the enactment of the statute of Charles 2d ?
In the leading case of Shires v. Glasscock, 2 Salk. R. 688, decided about eleven years after the making of the statute, “ when,” in the language of Buller, J. “ the reason and meaning of the clause in question were exactly kno'wn,” Sir George Shires being very ill in bed, the witnesses withdrew into a gallery, seven yards distant, between which and the chamber, where the testator lay, there was a lobby with glass doors, and the glass broken in some places. Here they subscribed the will. It was proved that the testator, from the bed where he lay, might have seen the table in the gallery on which the witnesses subscribed, through the lobby and the broken glass window. The will was established on this proof; and it was not deemed material to enquire in what way the witnesses sat down to the table, nor whether they had their faces or backs towards the testator. In the case of Davy v. Smith, 3 Salk. R. 395, a passage intervened between the two rooms; the same enquiry was deemed immaterial, it being proved that the attestation was at a table in one of the rooms, and the testator lay in bed in the other. The same observations may be made in regard to Casson v. Dade, 1 Bro. C. C. 99, in *123 which a lady’s will was attested in an attorney’s office while she sat in her carriage, which happened accidentally to stand at a window through which, as was proved by a person in the carriage, she might see what passed within. In Doe v. Manifold, 1 Maul. & Selw. 294, which was much relied on by the counsel for the appellants in Neil v. Neil, and which perhaps goes farther than any English case, except some recent cases in the ecclesiastical courts, against the validity of attestation in a different room from the testator and out of the range of his vision, the two rooms were separated by a passage into which the door of each of them opened. The testator lay in bed in one of them, and it seems was so sick as to be unable to leave his bed without assistance. The witnesses wrote their attestation at a table before the fire-place in the other room, and the doors of both rooms were open. The jury found that a person in the bed room might, by inclining his body and advancing his head into the passage, have seen the witnesses attest the will, but that the testator was not in such a situation in the room that he might have done so. The will was held not duly attested. Lord Ellenborough, C. J., after referring to Casson v. Dade, and saying that, in favor of attestation, it is presumed that if the testator might see, he did see, proceeds to say: “But I am afraid
that if we get beyond the rule which requires that the witnesses should be actually within the reach of the organs of sight, we shall be giving effect to an attestation out of the devisor’s presence ; as to which the rule is, that where the devisor cannot by possibility see the act doing, that is out of his presence. If the jury had not negatived the testator’s being in a situation that he might have seen the attestation, I should have had great doubts on this case.” What would his lordship have said, if the jury had found that the witnesses and the table at which they attested *124 were in full view of the testator and only seventeen feet from him, and that he was conscious of what was going on, and able to walk to them if he had chosen; but that, in the position in which he then was and chose to remain-, he could not see their forearms and writing hands and the will, at the instant of attestation ? What he did say sufficiently answers this question. Similar observations may be made in regard to the ‘case of Tod v. Winchelsea, 3 Cond. Eng. Ch. R. 474, and 12 Eng. C. L. R. 227; which, with the other cases cited and commented on, show that when the testator can see the witnesses when they are attesting in an adjoining room, the attestation is in his presence.
The case of Graham v. Graham, 10 Ired. R. 219, decided by the Supreme court of North Carolina in 1849, was cited and much relied on by the counsel for the appellant, and is the only case I have ever seen or heard of, which can be said to decide, if that can, that whenever the attestation is out of the room in which the testator is, he must be able, without changing his position, to see the will at the instant of the attestation. If that case could be said so to decide, I would only say that while I have great respect for the court that decided it, I am yet of a different opinion. But it cannot, and is a very different case from this. There the testator was lying in bed very sick in one room, and the witnesses signed their names at a chest in another. There was a door open between the two rooms. The bed stood by the partition between them, and two or three feet from the door; and the chest stood against the other side of the partition and nearly opposite to the bed; so that the testator, as he was lying in bed, could, by turning his head and looking around the side of the door, see the backs of the witnesses as they sat at the chest writing, but could not see their faces, arms or hands, or the paper on which they wrote; a view of those being obstructed by the *125 partition. The court below directed the jury, “ that, though the testator could have seen enough of the persons of the witnesses while they were subscribing the will, to enable him to recognize them, yet if he could not have seen what was going on whilst they were in the act of attestation, the paper was not properly executed and attested.” Ruffin, C. J., in the Supreme court said, “The rule laid down by his honor seems to be a very rigid construction of the terms ‘in his presence,’ which are used in the act; but it is in conformity with the cases hitherto decided on this subject, and we believe with the policy and meaning of the statute.” The only cases referred to by him are Shires v. Glasscock, Davy v. Smith, Casson v. Dade, and Doe v. Manifold, on which I have commented already. There are passages in his opinion, which, taken in the abstract, might seem to support the position contended for; but taken in connection with the facts of the case and the authorities relied on, do not. In that case, the witnesses were not in the range of the testator’s vision when they were signing their names. He could see no part of them from the position in which he then was; nor without a considerable change in his position on the bed, and looldng around the side of the door, which was two or three feet from the bed; and then could only see the backs of the witnesses, and could not see what was going on. The court below decided that the paper was not properly attested; and even this, the chief justice said, seemed to be a very rigid construction of the terms “ in his presence.” What would he have said if the facts had been the same as in this case ?
Here, the testator acknowledged his will before the witnesses, handed it to one of them, who, attended by the others, bore it off to the nearest convenient place, where they signed it in immediate succession; and the last who signed it bore it back to the testator. The continuity of the transaction was unbroken for an *126 instant; and during the whole of it the will and witnesses were fully in his view; except that while they were engaged in the act of signing, he could not see their forearms and writing hands or the will itself without changing his position; which, however, he was able to do. It is probable, from the elevation of his head, that he could see the will on the bureau during the brief intervals of the signing by the witnesses. If, as was said by Judge Cabell, in Neil v. Neil, the object of the statute is to enable the testator to see that those who attest the will are the persons in whom he confides, and to prevent a false paper from being surreptitiously imposed on the witnesses, surely that object was fully attained in this case.
The will was signed and acknowledged by the testator, and subscribed by the witnesses, at one and the same time, and in the presence of each other. It is therefore unnecessary to decide in this case, whether the statute requires the witnesses to be present at the same time, as well when they subscribe the will, as when it is signed or acknowledged by the testator.
I am for affirming the sentence.